Good morning, Your Honors. May it please the Court. My name is Kim Nguyen, and I represent Attorney General Kamala Harris in this appeal. I'd like to reserve three minutes for rebuttal. Please. Do you have any additional information to supplement what your colleague has stated regarding the status of the regulation or the procedure of enacting that regulation? No, Your Honor. I do not have any additional information. It is in the works, and the regulation intends to codify a policy of confidentiality. I do want to state— Is there— I'm sorry, Your Honor. Counsel said that even with the—or he suggested even with the regulation in place, it's still not sufficient because there's no real sanctions given past history for inadvertent disclosure. Are there any penalties attached to the regulation or contemplated so that it has some enforcement teeth to it? I don't know the nature of the regulation itself, Your Honor. I do know that in— It's not part of the appellate record, Your Honor. And I'd like to, if I may, Your Honor, go to where I think the panel is headed, which is with this regulation— Good luck. One thing that the panel may be headed toward is that if this regulation doesn't have the enforcement teeth or the mechanisms that the appellates have brought up, are we really talking about public disclosure here? And I think what we have to keep in mind with public disclosure is that, first of all, public disclosure is perfectly constitutional. We know that from the Citizens United case, we know that from the Buckley case, and we start with the premise that public disclosure is constitutional. So with that in mind, then we have—then it's up to the plaintiffs, the party challenging the disclosure requirement. It's incumbent on them to show the level of harm that this Court and the Supreme Court has recognized as sufficient to strike down that public disclosure requirement. And to be clear, that's not what we have in this case. We do have a confidential disclosure requirement. But if we were to consider a public disclosure requirement, what we know is that the level of harm that must be shown needs to be concrete, it needs to be systemic, it needs to be pervasive over a long period of time that threatens the very existence of the group and the ideas that the group brings to the marketplace of ideas, and harm that the government is unwilling or unable to control. And that is not the type of harm that we have in these cases, Your Honor. We're here on the Thomas Moore Law Center case. I will turn to the harms cited in that case. And there, the showing absolutely does not rise to the level, the demanding level that this Court and the Supreme Court has imposed to show that level of harm. So we have an instance of one of the law center's clients receiving death threats as a result of staging a Prophet Muhammad cartoon drawing contest. First, that's not sufficient because there's no causal nexus between that death threat and any type of disclosure to an analogous governing body. And we know from the case from Doe versus Reed on remand, from Protect Marriage versus remand, that death threats in and of themselves do not constitute, again, the systemic, pervasive, concrete level of harm that you have to show before you reach a cognizable First Amendment injury. So next, we move to a statement in the declaration of Richard Thompson, the President of the Law Center. He says that the CEO of a nationwide supermarket chain made some comments about employer coverage for contraceptive health care for employees. And in that declaration, he says, the business was negatively affected. Economic boycotts, protests in front of storefronts, again, not sufficient to show First Amendment harm. We know that from the Protect Marriage case. Let's contrast that to what the Supreme Court has recognized as enough, and that is rank and file members of the NAACP and the Socialist Workers Party actually losing their jobs because of associations with these groups. That's nothing like a nationwide supermarket chain having its business negatively affected. Next, we move to the negative criticisms on Internet blogs, the hateful emails, the vulgarities in these emails at the Law Center sites. Again, no causal connection to the disclosure requirement at issue. And moreover, we know, again, from the cases, this type of speech is not enough to show First Amendment harm. I'd like to add that they also state that their email system routinely deletes all of these emails with vulgarities. What about the chilling of associational rights, that people who would have contributed declined to do so because of fear of reprisals? Yes, Your Honor. So what we know from Buckley, there were affidavits in that case that said members would no longer contribute if they knew their identifying information would be deleted. Affidavit that said contributions are going to virtually dry up. Dole One, this court said, not enough. And I think it's important when we think about contributions and these types of associational chills to, again, look at the group that we're talking about. The Socialist Workers Party, that was 60 people in that group. And they were on the virtue, after years of government surveillance and harassment, shots fired in their windows. They were on the virtue of being extinguished, and they couldn't bring their ideas to the marketplace. So we have to remember, let's look at the alleged harm, and let's look at the nature of the group. And here are the plaintiffs in this case. We have Americans for Prosperity Foundation. They themselves allege they're backed by billionaires. We have the Thomas Moore Law Center. I'm sorry, they allege what? I'm sorry. Backed by billionaires, Your Honor. The Thomas Moore Law Center, which they represent Christian ideals and a Christian heritage, Christianity being the dominant religion in our country. So again, we have to look, what is the harm that they're talking about? Is there any tethering or causal nexus to the requirement issue? And is it the type of injury that is systemic, concrete, pervasive, that threatens their existence, that the government is unwilling or unable to control? So that's the type of harm that courts, that the Supreme Court in this case- Well, let's say that the type of harm demonstrated thus far in this case don't rise to the level of the burden or the infringement that you're talking about in those other cases. There is a type of harm that is systemic, concrete, pervasive, that threatens their existence. The interest at stake here, Your Honor, is the information that Schedule B provides to the Attorney General in assisting her to prevent and combat fraud, misappropriation, and self-dealing. We know from- Well, that's the collection and the confidential collection of information that's in the Schedule B, but then the AG doesn't have any interest in the public disclosure of information reflected in Schedule B. Isn't that right? Obviously, you don't have any, because you're preparing a regulation to prohibit it. Yes, Your Honor, that's right. The answer has to be you don't have any interest in the public disclosure of the information. Well, I want to back up from there, Your Honor. I think the Attorney General has a very strong interest in enforcing the law, protecting the public trust- That's the collection, right. And preventing fraud. And use the collection and use in the Attorney General's office, laying that aside. Yes. Judge Wynn said you don't have any interest in public disclosure, do you? And your answer has to be no, we don't, because you're prohibiting it. We are- If the regulation were to be enacted. Right. It's not your policy to prohibit it. And the regulation would strengthen that view. Yes, Your Honor, there is a regulation in place to make that- to keep that information. There is a regulation in place to codify a policy of keeping that information confidential. Well, it's not in place. It's been proffered. Yes, you're right, Your Honor. You could- it's not part of this record, you said. That's right. It's not, Your Honor. So you're dodging the question, which is, you started out with disclosure, public disclosure. That's what you said. Public disclosure is constitutional. But it comes down in this case to, so what? The question in this case is, do you get the information for internal enforcement use, but recognize- the state itself recognizes that it's not to be made public. So does that not imply some concern on the part of the state that if it were, in fact, the IRS regulation, this law the same. Does that not imply a recognition that donors to charitable organizations don't expect when they give in their private decision-making that they will not be listed in a public record, at least when they report it to the IRS and when they report it to the state? Since both the IRS and you're proposing, it will not be made public, and in fact you'll take steps to make sure that the public disclosure statutes in California have no exception for this because it's been prohibited by the state. So where does that leave us? Yes, Your Honor. The information is being kept confidential. The state has an interest in keeping the information. What we have in this case is a confidential disclosure policy. There are interests in keeping it confidential. What we are saying, Your Honor, is that if what we're talking about is public disclosure, which is what we don't have in this case, it's still the case that it's incumbent on the plaintiff to show a level of harm that would reach a level of cognizable injury that courts have recognized as sufficient to strike down a public disclosure requirement. Well, I understand your argument, but it's a little troublesome that, as Judge Winn pointed out, you're not trying to make it public. So the steps to keep it confidential by the state are consistent with what the plaintiffs are complaining about, which is risk of harm and chilling effect, and they wanted an assurance that it won't be leaked to the public. And they have those assurances, Your Honor. And that sort of feeds back to the problem we were talking about earlier. And the other case is if there's a remedy in the works to put teeth in the nondisclosure, then a lot of this sternum and drawing might be unnecessary. This is not a campaign disclosure case. It's not even Prop 8, where there was a campaign, an issues campaign. So it's, in some sense, a narrower subset of those cases. And one of my concerns is in the enforcement mechanism, you will take the information and turn it off. I think I signed the briefs. There will be available to 60 members of the AG's office, and we know that there can be leaks in government. So if we're going to be balancing things, one aspect of this case is balancing the policy of confidentiality so that you can, and the AG's office, do your legitimate job. So, I mean, we've already got CCP, which says you have a legitimate interest in enforcing the law. So the question in this case comes down to, can you do your job without risking the public disclosure, which is your policy to implement? So there's a lot of good talk about these other cases in the Socialist Party and NAACP, but we've got a narrower case here. That's right, Your Honor. We do have a case where the disclosure... Well, you're well over on your time already. Thank you. Yes, thank you, Your Honor. So isn't that what you're concerned about? Go ahead and say who you are. Oh, good morning. My name is Louis Castoria. I'm representing the Thomas Moore Law Center. And Sheila Pham is here with me as well. No, introduce your colleague. My colleague is Sheila Pham, also of Kauffman Dahl, which I apologize for. Just to maintain the little momentum I added there, if any, is that what it boils down to in this case? That your concern is the information of donor lists goes to... it already goes to the IRS, right? Correct. Okay, and so you haven't sued the federal government, I assume. Not yet. Nor has the IRS put our donor information on their website for the public to see. Okay, and if the state of California replicates that regime, then isn't your problem solved? Unfortunately not, Your Honor, for a couple of reasons. Number one, the purpose to which the information is put is different between the IRS and the Attorney General's Registry. The IRS is looking to see if people are legitimately claiming deductions for contributions to charitable trusts. Of course, to know that, you have to see who's contributing how much to whom. That's what Schedule B does. The Registry's interest is to see how the charitable trust uses the money, not where it comes from. And there's been no connection of the dots by the Attorney General's office in this case, or the other one, to show that because they see who donated money, they can connect that to how the money is used. In fact, counsel earlier was referring to the information that's in front of this court on the... Why is it that if they have no information, no interest in seeing how it's used, if the money all goes back to the donors who have set up... I mean, we're just across the country, but we've just been reading about the trials in New York. There, the offense was how they used the money. And certainly the Attorney General, it would seem to me, would have a question as to the legitimacy of the charitable deduction if the money were just given and passed back to the contributors. But we already have to, and we do disclose how the money is used. So the Attorney General and the Registry know the money from Thomas Morelau Center or other organizations goes to specific purposes. In our case, it's easy. But these purposes are attached to actors. Isn't there the issue of conflict of interest? Or you haven't answered Judge Reinhart's question. If it's just going back to the donor, to some... Straw company. The straw company that's out polishing, you know, whatever they're doing, laundering money for all they know. Well, we also separately have to identify any related party transactions, which we do. And the AG's office gets that. We also have to disclose where the money goes out from. And because the Thomas Morelau Center has a very specific and narrow purpose, and that is legal advocacy in courts to support free speech and free religion rights, which is somewhat different than what we've been talking about before. If you saw money going out from Thomas Morelau Center to an individual or to some other trust or to some corporation or whatever, that isn't payment to a law firm to advocate in court on behalf of one of Thomas Morelau Center's clients, that would tell you. They don't need it as to us. And the other reason that the suggestion that's been made doesn't satisfy our problem is, all right, so number one, they haven't connected the dots. What they do say is that they need the information, but in their deposition testimony, as counsel referred to, they can't identify a single case in all the other organizations that do provide Schedule B where any of that information has ever led to an enforcement action of any sort. Well, maybe that shows it's a pretty good system because they've got a system. There's no corruption. It's something that's so important and elemental to their work that they've never had to use it. Isn't that something? I mean, it's like saying the end of the day. It's very successful because they've collected this information. People haven't been interested in cheating. They go to Nevada to cheat. I imagine Nevada's got separate rules of their own. The other reason it doesn't adequately deal with our problem is this. How does the registry use the information that they get now from other sources? In the declaration in our case from Mr. Baumann, their witness, they say they use it to make phone calls. They use it to contact people who are listed on Schedule B to identify witnesses. And can the court imagine a more precise definition of chilling effect than, hello, I represent the chief law enforcement officer of the state of California, and I'm calling you in Missouri. Are you saying the people who have contributed to the Thomas Moore Law Foundation have been getting these calls? No, because we have not been giving out our Schedule Bs to the attorney general's office. That's a very efficient system, too. We don't know that there's any reason to think they're going to call people who contribute to such a fine, outstanding Christian organization. Except that they testified under oath that that's what they do. That's what they do with us. That's what they do when there's a potential problem. You really think they're going to think there's a problem with your organization particularly? I would quote the court to the idea that we can't rely on the government to exercise noblesse oblige. I wouldn't take that. I mean, you described the organization, and I think I got an award from the Thomas Moore. Maybe I should recuse myself. God bless you, Your Honor. I guess cases aren't really based on what people say. There's some theory or principle or rule of law that you would like to establish, but I must say it's rather surprising to hear you worry about the safety of people who contribute to the Thomas Moore Law Society. Your Honor, I don't have to speculate about it. Now, the Attorney General throughout her briefing says that our evidence is speculative. It's real. It's real-life things that have happened. Now, those were our clients, and they're... They're clients. I understand why they get threats. But their names are in the public. They put themselves in public by definition because they file suits to do things. Well, but I don't see what that... I must say I find the idea of the threats to people who contribute to you. The fact that the people who you represent get threats is not surprising, but if they get threats, whether they were represented by you or by the ACLU, it doesn't matter who represents them. Those people will get threats. Somebody needs to represent them. We do sometimes. There's nothing wrong with representing them, but the fact that clients get threats has nothing to do with whether people who contribute to your organization get threats. Your Honor, it's just another step, though. It's only one step away. Once the names got out there, and let's assume... Well, you know, it's like saying it's one step away to say we should have no Muslims to we should have no Jews, we should have no Christians. Everything's one step away, but it's not the same. We don't have to look very far, either in time or location, to see that ordinary people who are not public figures are subject to essentially a death penalty because of the rest around them. Abortion doctors have been one step away. That I understand, to a death penalty. Not through our efforts, Your Honor. Pardon me? Not through our efforts. We are not a Christian jihadist organization. I was not suggesting it was your effort, but I was saying there are... Your argument that one step away is true in some cases, that doesn't mean it's true in other cases. Wouldn't Your Honor feel, and I know you get to ask the questions, but forgive me for this one, wouldn't Your Honor feel a little less likely to give money to the Thomas More Law Center if you knew that your name, your information, could very well be leaked out and that somebody who wanted to do what, in fact, was tried to do to Pamela Gellar... I'll answer your question, which I don't normally do. I wouldn't feel any less likely than I feel now to contribute to the Thomas More Law Center. Okay, but counsel... We appreciate your generosity. Counsel, has the IRS regulation chilled your donors? Not that we know of. Because they don't fear that it will be leaked out of the federal government, which has been famously hacked. We got it. Our names are out there. All of our employees are out there. They got hacked. So there's nothing sacrosanct these days about being in the files of the federal or the state governments in the sense of hacking and the like or inadvertency. But quite seriously, there is a regime already in place where the donor identifications are submitted to a government agency, and it has not. You haven't claimed, and there's no evidence. It has chilled any of your activities. It's one governmental agency, one federal agency, that has specific laws with criminal penalties for anybody abusing the information. That comes back to what I opened with then. What is wrong with the regulation that is being proposed? Why isn't that regime where they start out with the policy of confidentiality, you don't think it's adequate, they reinforce it with a regulation? So isn't the remedy in guaranteeing or giving the same level of assurance that you're satisfied that the IRS provides? I don't have the regulation. I don't think it exists in a form that we can say this is exactly what it will do. But I do know this. With the IRS, it's one risk that everybody across the country takes that somebody might hack the IRS system. It so happens, and we've cited cases, where the IRS itself has been held liable for an inadvertent disclosure of Schedule B information and been held liable for damages. So there's that protection, but by that time the cat's out of the bag. The risk of saying a state can do the same thing, it's one thing to say the Attorney General of California has a legitimate need, which I guess would apply elsewhere. So if you take 50 more jurisdictions and give them nationwide donor lists, now the risk is multiplied because you can't guarantee that every state government has as good a security system as the IRS does or has as strong an enforcement and punitive measure system to punish those who abuse it. It's nice to hear some praise for the IRS. I don't think I've ever heard that in court before. Well, this is not April, so there's an exception. I want to just bring to the Court's attention, I know my time is short. Your time is over, so try to wind up soon. One case, one case, Your Honor. U.S. Supreme Court Riley v. National Federation for the Blind, a case the Attorney General relies upon. A case in which, among other things, the law in question required the private foundation to disclose its donors to the state of North Carolina. And the Supreme Court in that case, at page 795, equates the disclosure of donor information with speech. It says that mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the act, the North Carolina Act, as a content-based regulation of speech. It's the same thing here. The law center advocates in court. Now the Attorney General of California is saying, we want you to give us a list. We want you to give us information, and we're changing the speech that you give on behalf of your donors by doing that. And it's simply unconstitutional. And, by the way, I'm not here for a case management conference on the APF case, but our trial date is at the end of June 2016. Thank you. Thank you. Thank you. We'll give you one minute. Thank you, Your Honor. I can speak quickly. Thank you very much. What counsel was referring to with regard to that quote was a quote in Riley v. National Federation of Blind in North Carolina. And let's be clear in that case. The Supreme Court said, you can't force a fundraiser to make an at-the-moment financial disclosure at the time the speech is being made, because that will chill protected speech. Court goes on to say, it's perfectly acceptable to require an after-the-fact financial disclosure to promote the interest of transparency, of allowing the public to examine charities. So let's be clear. That is, what we have here is not an at-the-moment restriction on speech. What we have here is an after-the-fact disclosure. Well, I did notice at 795 that they say, we do not suggest the states must sit idly by and allow their citizens to be defrauded. Yes, Your Honor. That's right. I do see my time is up. Do you have something you feel a great urge to tell us in another 30 seconds? Yes, Your Honor. I would just like to point out that the statements counsel made about Schedule B not being useful or at all helpful, all of that is outside the record. We have Steve Bauman's declaration that says, Schedule B is an important tool in helping the Attorney General identify and prevent fraud, and we have that in CCP as well, Your Honor. This Court has said that the disclosure requirement serves compelling governmental interest in enforcing the law, protecting the public trust, and preventing fraud. And with that, I would respectfully request that this Court reverse the issuance of the preliminary injunction. Thank you very much for your time. Steve Bauman says he uses the information to call up donors, and counsel argued that was chilling and potential harassment. Bauman does say how it's used. I agree. Yes, Your Honor, but there's no evidence that that is at all would have a chilling effect on speech, Your Honor. All right. Thank you. Thank you, Your Honor. The case is adjourned. It will be submitted. The Court will take a brief morning recess.
judges: Reinhardt, Fisher, Nguyen